Thank you, Your Honors. And may it please the Court, Christopher Wrench, Deputy Attorney General, on behalf of the Appellant, the State of California, I'd like to reserve five minutes of my time for rebuttal. You'll have to watch your time and hope we don't bombard you too much. I'll catch myself. Your Honors, both Propositions 89 and 9 comply with the ex post facto clause. The addition of the Governor as an extra reviewer into the parole process via Proposition 89 is consistent with decisions from this Court and the Supreme Court holding that adding decision makers to review process do not violate the Constitution. Proposition 9 is also constitutional. The voters of California's decision to amend the deferral periods following a parole denial is consistent with the flexibility the Supreme Court affords States to experiment with different parole procedures. Well, on Proposition 9, this is not a facial challenge anymore. This is an as-applied challenge, correct? Correct, Your Honor. And in Pew, the Supreme Court seems to say that all that needs to be shown is a substantial likelihood of a lengthening of the prison term for there to be an ex post facto violation in an as-applied challenge. Given the factual record in this case, why doesn't it meet the standard that the Supreme Court has recently set? Well, for several reasons, Your Honor. I think when we, whether it's Pew or Gardner, and we look at the significant risk test built into that is a deference for States and an acknowledgment that States have to lead the way. Deference is not a rubber stamp. Deference goes only so far. Certainly, Your Honor. And I think the starting point to answer Your Honor's question is the three grounds that the District Court specifically found an ex post facto violation on. The first, the District Court cited that Proposition 9 increased both the minimum deferral periods and the maximum deferral periods. And it's important to go back to both Gardner and Morales, which cautioned that factual differences between the Supreme Court cases and subsequent laws are not enough to create a significant risk. We have de novo review of this question, don't we? Excuse me, Your Honor? Do we have de novo review of this question, whether Proposition 9 as applied violates ex post facto as distinct from underlying factual findings of the court? Correct, Your Honor. It's de novo review. Okay. So without arguing with the District Court, why doesn't the record here demonstrate the substantial risk? Because the facts below combined with the law do not meet the rigorous demand of Gardner of non-speculative evidence on a class-wide basis. Additionally— But I guess the question, you know, Prop 9 is the harder for me of these issues. And the purpose of Prop 9 is so that victims don't have to keep going in, you know, ad nauseum parole hearings, right? Just that, you know, it just gets denied and then they have to go back and they have to see the person, the murderer again, and just go on and on, right? Your Honor, that's part of it, but I do think there's a broader purpose to the law. And what's the broader purpose? Which is to better utilize the state's resources. Gardner itself recognized that spacing out hearings could increase parole grants. And I think part of what the voters here were doing was saying, in addition to the burden on the victims, was saying we're holding too many of these hearings that are resulting in denials. And it's expensive, it's time-consuming to send commissioners all across the state to different prisons. Well, but that isn't a defense to ex post facto, because if you decided to, you know, lengthen prison terms because it's easier or cheaper, that doesn't make a lot of sense. But suppose that were your motive, it still doesn't really answer the question, does it? Your Honor, I don't—I agree that the intent of the law is not—it doesn't answer the question per se. But I think it does put it in context. And I think as the Sixth Circuit in Foster v. Booker looked at, when there hasn't been an impaired grant rate post a law like Proposition 9, as well as no showing of extended incarceration, that shows no ex post facto violation. Well, Foster predated Pew. Isn't that kind of—don't we have to conduct the analysis in line with the Supreme Court's most recent pronouncement? Your Honor, I think Garner is— Garner was 2000, right? Correct, Your Honor. And Pew is 2013. Pew did not deal with a deferral period, and Pew— Well, Your Honor, Garner didn't require certainty. Garner was a significant risk of prolonged incarceration, which I think is the standard that Pew was talking about. I don't view Pew as softening Garner or really doing anything to Garner. It cited Garner. It didn't specifically undo any of Garner's reasonings or holdings. So I think the standard is significant risk of prolonged incarceration. Well, but are you arguing that to diminish the significant risk, you have this PTA thing that— but let's just assume that no one ever—if they had shown that it was just impossible to get PTA review and that no one ever got a hearing and no one ever got paroled and all of that, is that what they would have to show? Or would you concede at that point that the PTA wasn't really a safety valve to the length and parole hearing? If the board were not considering petitions that were submitted, that would be an ex post facto problem. What the petition to advance process does is it gives the board an opportunity to exercise its discretion in between— But if it never exercises it, why isn't there a substantial risk of longer incarceration? Your Honor, if the board never exercises discretion— Almost never, since it's a substantial risk test. Your Honor, the board here has exercised its discretion every time it receives a petition to advance. That's undisputed on this record. Has it ever advanced, though? It has, Your Honor. And I would emphasize there's a difference between granting or denying a petition versus not exercising discretion. Well, that's a fine point when the question is whether people are incarcerated longer if they have the opportunity, but the opportunity is denied 95 percent of the time. They're substantially risking longer incarceration. I mean, to say, well, we're going to exercise our discretion, but we're almost always going to say no, it doesn't seem to fit what is required. Your Honor, I think it does because we'd have to go back to the pre-Proposition 9 world. The inmates here, they're never promised a favorable exercise of discretion. What Proposition 9 has done is just created an alternative means for that exercise. If you go back to Garner, what the Supreme Court said in Garner— Not an alternative means. It's an alternative time, which is different. Proposition 89 has to do with means, but Proposition 9 has to do with time. Well, it's timing, but it's still not a substantive change in the decision. It's not saying the board is going to grant or deny parole more often. It's just saying the consideration is going to occur at different intervals. But how does the—they do that risk analysis, right? And they do that every five years. Did they do that prior to Prop 9 when people were getting parole hearings every year? Was that still done every five years, or how does that work? Your Honor, when you say the risk assessment, are you talking about the psychological risk evaluations? Yes. Yes. I mean, because Judge Carlton seemed to find that to be problematic. He was concerned about that, and that hadn't changed. That five-year period was in the board's regulations before and after Prop 9. Well, but pre-Prop 9, if they were coming up every year, did there always have to be a current risk assessment in order for someone to be granted parole? Not necessarily. I think we'd have to tease out what Your Honor means by current. There's always a most recent psychological evaluation in the inmate's file. It's not always done immediately before the hearing. It might be a couple of years. So even when it was every year, they still were only doing those every five years? Correct. And so that doesn't change post-Prop 9? Correct. But Judge Carlton seemed to find that to be problematic in terms of a person being able to show their suitability. How is it different at post-Prop 9 as opposed to pre-Prop 9? What the district court was talking about in the couple examples it relied on was in the petition to advance context where an inmate might submit a petition to advance and not have a new comprehensive risk assessment done between the last hearing and the submission of that petition to advance. And I think what the district court overlooked is that all a petition to advance, the burden is to show a change in circumstances, and an inmate doesn't need a new report to show change in circumstances. If his psychological disposition, if his insight into the crime, whatever the issues are, have changed, the inmate can show that via the petition to advance and coursework he may have taken in prison or whatever the change may be. How can he show that he's gotten better mentally without a psychological evaluation? Your Honor, he can write it on the piece of paper and say, my last doctor said this, the last panel found me deficient in these ways, here's how I've changed. I now view things differently or I've taken courses, self-help programming type things at the institution, and those courses have made me look at things differently. So self-serving, non-expert opinion is to rebut the psychological evaluation which was perhaps detrimental to him? In that hypothetical, it could be detrimental, but it's important to go back to the standard of the petition to advance. It's not the inmate has to rebut everything. It has to show a sufficient change in circumstances. So what the board is doing when it reviews that submission is saying, based on what the inmate says, based on the psych report, is there enough change there where we need to bring him back for a hearing sooner than initially scheduled? And that's the exercise of discretion that's essential to the petition to advance process, and it's a call for the board to make. Was Judge Carlton asking the questions right, or in terms of the evidence that he was hearing, or are you saying he wasn't really asking the question right? Your Honor, he asked the exact wrong question in the petition to advance context. Garner talked about the essence of these cases is not how discretion is exercised, but if discretion is exercised. So the question in the petition to advance context is not how the board decides a petition to advance. It depends on what discretion you're talking about, because originally the discretion that was exercised was, shall we grant parole on the merits? And now it seems to me that the discretion is one step back. Shall we even think about it? I'm sorry. I missed the last part, Your Honor. Shall we think about whether to advance it? In other words, it's moved from discretion on the merits to discretion about whether to consider the merits. Well, it's still — it is a slightly different question. It's a very different question. But it's still a question of the board's commissioners are looking at the record and making it suitable. You use the word discretion, and it's like a magic cloak to say, well, if there's an exercise of discretion, it doesn't matter what it's discretion about. As long as there's discretion, you know, King's X, you can't look behind that. And it seems to me just a different sort of discretionary decision. Well, Your Honor, I would say a couple things to that. When this case came before the court for the preliminary injunction, that issue was really before the court, because when we're talking about the difference in the petition to advance it — Not as applied. It was only here facially. Correct, Your Honor. But I think — and where I was going is facially the difference in the questions is constitutional. I think that's been resolved. The as applied part, what the district court did here was second-guess the board — the merits of the board's decision-making. And that's inconsistent with Garner, and it's really inconsistent with due process jurisprudence in Swarthout v. Cook, which said Federal courts don't review the merits of a board's decision-making. That's a very different context. You're actually asking us to forego a decision on ex post facto because there's an exercise of discretion. And I don't think Swarthout goes anywhere near holding that. Well, Your Honor, I think it would be inconsistent for the court to say, in an actual parole suitability decision, we don't look at the merits for due process purposes, but for ex post facto — I'm sorry. Well, we don't look at it in the sense of saying, well, gee, we think that guy gets parole, and that guy doesn't get parole. That's not our job. But in terms of whether they are getting the appropriate consideration at the appropriate time, that is our job. And so it sounds — I mean, I'm trying to think of an analogy, but it's like saying, well, a university has discretion whether to admit students based on their grades and all those other things. But then one step back from that, they may decide, well, we're not even going to look at the applications of some people because we're too busy or we have other reasons why we're not going to. And so it's kind of that one step back, it seems to me, that we're dealing with here. Well, Your Honor, in that analogy, what Proposition 9 says is for one of those — or, excuse me, one of those students who says, you know, we're not going to look at you for a while. That student would have an opportunity to say, no, this is too long, here's why you should look at me now, and force the college to exercise its discretion about that. And that's what Proposition 9 allows. And every petition to advance has been submitted, and there haven't been that many. The board has exercised its discretion and decided, you know, was the initial deferral appropriate, given what's happened, or was the initial deferral perhaps too long and we need to bring the inmate up for consideration sooner? So what were the numbers in terms of the people that got to have an earlier, that it was advanced? In terms of the grant and denials of the petitions to advance? Yes, what were the numbers? I think it was 91 percent of them were denied of the 800 to 850 or so that were submitted through 2012. And that's a very small fraction of inmates who were actually denied parole during those years. So the vast majority of class members didn't even engage the petition to advance process, didn't even stand up and challenge the board and say, no, the deferral you gave me under Prop 9 is too long, things have changed, look at me sooner. Most inmates never made that assertion. Have you changed anything since you were before Judge Carlton? Is your process exactly the same? The process has played out now. At the time of trial, the process had changed, and the board's executive officer testified to those changes. So the changes were in place, but because of where the record was cut off, and of the district court, the sort of practical implementation and evidence of those changes was not in the trial court record. Thank you. You're down to about three and a half minutes or thereabouts if you want to save it. Thank you, Your Honor. I'll hear from Ms. Knox. Good morning. The Attorney General is already here. Could you introduce yourself for the record, please? Yes, Monica Knox for the plaintiffs. Good morning. The Attorney General's argument on Proposition 9 is entirely divorced from the facts, the undisputed facts that were presented at trial. The evidence shows that there is a significant risk. The district court recognized, and this court recognized earlier when it was up on a preliminary injunction, that there are certain changes that create that risk. No, just a second. In Gilman 1, we said it appears that there is this risk. And then the next paragraph said, assuming but not deciding that there is, we went on to advance. So I don't think it's quite right to say that we found there was a significant risk. Okay. I didn't say found. I said recognized. And to the extent that you encountered it. We didn't recognize. We saw the problem. We skipped the problem by going on to the advance hearing as a problem of facial validity. But let's not get stuck up with an error in analysis. Okay? I didn't mean to suggest there's already a holding by this Court. Now, isn't your basis for saying there's significant risk using the Rutherford cohort to show that if your cohort had been given the same procedures as the stipulated procedures under Rutherford, they would have gotten a shorter incarceration period? Yes, that is correct. Secondly, what control as to in-prison behavior was used to compare your cohort to the Rutherford cohort? None. Thank you. The evidence indicates that the Rutherford group was chosen solely as a matter of calendaring. All right. And the experts disagreed, but Judge Carlton found that Professor Chrisburg was more reliable. Was there a Dobert objection? Pardon me? Was there a Dobert objection to Mr. Chrisburg? No. There was no Dobert objection. So if there was an error in admission of expert testimony on the statistical method used, what your position is, is we review that for plain error, if any. If it were before the Court, but nobody's raised that issue. Actually, I don't believe. Is that an issue that was raised? Never. In the opening brief? It was never raised in the district court in the opening brief any place. As I read the opening brief of the appellant, they raised the issue that the testimony of Dr. Chrisburg was not valid because they didn't use the proper controls. It wasn't randomly selected. Your group wasn't randomly selected. Neither was Rutherford. There wasn't any control for matching. Correct? What they have argued is that the Court should have credited their expert instead of our expert. But they didn't. At least as I read it, they weren't saying that your expert shouldn't have been allowed to testify. They just said their expert was better. Right. Right. Did they argue that the Rutherford, that it was really not, that it was inapposite, though? However, it didn't, it was like comparing apples to oranges? Did they argue that? They presented Dr. Klein as their expert, and he, in fact, did opine that you couldn't tell whether it was representative or not. But he made, and Judge Carlton found, very specific errors in coming to that conclusion. And it, and he had very little experience with criminal justice issues to start with. Dr. Chrisburg had many in the role of parole. He teaches parole law at Bolt. And he talked about it being a natural experiment, that it was selected solely by an issue that had nothing to do with whether somebody was parole-suitable or not. And so there was no reason to think that that group was more suitable. I'd also indicate that we presented more evidence than that, more than the Rutherford group. We presented other evidence, including from court-ordered hearings. And we also presented, as to the Rutherford group, we could show that their grant rate, when they did go to hearing, the board found them suitable in almost the exact percentage they found the group as a whole suitable during that same time period, which, of course, suggests that they were representative, that they were picked for a reason. You know, the Attorney General stood up here just a minute ago and was talking about grant rates of certain groups. Well, over the years, when you look at any grant rate, you don't know that that group is representative, because that happens to be the grant rate of just the people who went in 2012. It's a matter of calendaring. Every time you talk about grant rate, it's a matter of calendaring. Well, I guess the question go ahead. Did you say that they did, that the opening brief did not question the representative nature of the Rutherford group? No. I said they didn't question the admissibility of the evidence on it. They do, in fact, question. They say that Clines, their expert, should have been credited over our expert. But you say that that should be reviewed on an abuse of discretion basis. Yes. I think the law is clear that it is up to the trial court to decide which expert is more reliable and which one to credit. There was no systemic challenge. There was no challenge that this was inadmissible evidence or it wasn't subject to expert testimony. In fact, they put on their own expert testimony on the issue. So are we reviewing the injunctions from your perspective on Prop 9, then, de novo or for clear error? Or for abuse of discretion. There are several possibilities. Yeah. Well, on the issue of which expert to credit, that would be abuse of discretion because that's up to the district court. As to the court's findings — What about the effectiveness of the PTA? Is that a factual finding or a conclusion of law? I didn't get the first part. On the effectiveness of the PTA. Because I think Judge Carlton said the PTA wasn't effective, right? Is that a factual finding or is it a conclusion of law? It's a factual finding. And, in fact, it is supported. I mean, again, the State's argument is divorced from the facts. You know, the issue for it to make a difference, the PTA process, it would have to have a reasonable chance of identifying the prisoners who have, in fact, moved from unsuitability to suitability in less time than their Prop 9 deferral and to get them to hearing in the time they would have gotten to hearing under the old law. And I'd like to say something about the timing of that because that's critical. Even if the PTA process didn't have all the inherent problems in it that were identified and found by the district court, there is no way a prisoner could get to hearing in one year the way that he used to be able to get to hearing in one year under the old law, which means he necessarily waits. Their own evidence showed that from the time a PTA is reviewed, it takes nine months to get a case on calendar. Some of that has to do with statutory and regulatory obligations of notice and things like that, but it takes nine months. But now, wait, if it were pre-Prop 9, was this same group always getting yearly or were some of them three or five years then, pre-Prop 9? Pre-Prop 9, the default was one year. The only way the board could give something more than one year is if it found it was reasonably unlikely that the prisoner would be suitable, and then they could in non-murder cases go up to two years and murder cases go up to five years. As the evidence showed at trial... Oh, in pre-Prop 9, everyone wasn't. The default rule was one year, but everyone wasn't. The default was one year, and the evidence showed that 35 percent of all prisoners who went to hearing each year got one-year deferrals, and another 32 percent got two-year deferrals. The deferrals no longer available under Prop 9 went to two-thirds. But is that group the same as this group in that this group is all people that got life with the possibility of parole, right? It's exactly the same. The group's the same. I'd like to go back to an issue that was discussed by the court with the Attorney General about the CRAs, the comprehensive risk assessments. It was not the same before Prop 9. In fact, it wasn't even the same after Prop 9 until a couple of years after Prop 9. It used to be that you had, every time you went to hearing, and if that was every year, you had a report done. They then changed that when the board changed the process from having the reports done by Department of Correction sites to their own sites. They created a forensic psychiatric unit in their own sites and started doing the reports. It went up to you got a new report every three years. But the board could ask for a report sooner, and often it did. If they had a problem with the report, they would often say, okay, we're going to put you on calendar again in a year. We are ordering a new report be done for that next hearing. Their regulations changed only a few years ago, a couple of years after Prop 9 passed, to this five-year, and that it can't be done more than five years. And what the evidence shows is that if either the panel relied on the assessment in the psych report as one of its reasons for denying parole, or the psych report had anything less than an assessment of low risk, that consistently what the PTAs that had that issue in it, consistently they were denied by saying that the report remains valid and until there's a new report. And that was true even when the prisoner could provide some kind of new report. There are examples of prisoners providing private psychiatric assessments, and the board wouldn't consider those. And there were examples, at least one example, of somebody who presented a CDC, a Department of Corrections psychiatric report, intervening between his old hearing and his PTA, and he was still denied. So how many people are in this group right now? In what group? Our class right now. The class on Prop 9? Yes, your class. I don't know exactly, but it would be over 10,000 people. It would be anybody who's serving a life term who committed his offense before November 2008. That's a pretty big class. That is a big class. The Prop 89 is a much smaller class, but the Prop 9 is the big class. The Attorney General raises Dukes v. Walmart as a reason why we should reverse on the ground that Judge Carlton found that only some of the people in your class would be entitled to grants of parole and, therefore, a shortened sentence. What about the argument that an injunction such as Judge Carlton has entered would not solve at one stroke the issue of continued incarceration for your people? Well, this is very different than the situation in Walmart, which didn't have ‑‑ First of all, did you have a class certification in the hearing? Yes, and, in fact, there was an interlocutory appeal on certification, the appellate certification. That's law of the case. Yes, although Walmart came down after that. Oh, okay. So it's an old, old class. And they did ‑‑ the State did move to decertify the case in the district court after Walmart came down. That was litigated and they lost. And they have not appealed that. So, again, it's an issue that's not before the court. Well, they haven't appealed it by interlocutory appeal, but they raise it in their brief, don't they? No, it's not in the brief on appeal. It sure is. There is a citation to Walmart, a single citation to Walmart, which said in their argument that the injunction was overbroad. But they didn't ‑‑ they haven't raised the issue that the class was improperly certified. Now, on the issue of the breadth of the injunction, it's important to understand, as Judge Cardin recognized, that parole is a process. We presented evidence of the Rutherford group and a lot of other prisoners who were very close to suitability. And, in fact, when this case was before the court earlier, this court recognized that the experience of most of the named plaintiffs had been, you know, several one‑year denials and then a grant before they got out. Virtually all ‑‑ not all, but virtually all prisoners are going to get out at some point. The grant rate now is at over 20 percent a year, so that's a fifth of people who go to hearing every year who are being granted and released. But more than that ‑‑ Are those mostly ‑‑ I'm not seeing a lot of the murderers getting out. Yes, it's many. Most lifers, 85 percent of all the life prisoners inside are inside for murder. And so most of them are, in fact, murder cases. And so when they pled guilty, regardless of what the parole situation is, they knew they could do a life sentence, right? Yes. I mean, you're not promised parole hearings at any particular time. Right. I mean, I know, like, I took pleas on murders, so nothing part of the colloquy says at a certain time you're eligible for parole. No, California law does. California law absolutely does that. It says that you do ‑‑ But they're told they got a life sentence. You got ‑‑ and so you're facing the potential of a life sentence. There's always the potential of actual life sentence. That's true. But the Supreme Court has recognized that that does not matter in looking at ex post facto issues that have a significant risk of affecting how much time you actually do. The reality is that most of the prisoners who have life sentences will not spend their entire life in prison. And the ‑‑ But how does that ‑‑ okay, but in terms of ‑‑ but here we have to look at when Prop 9 comes in, how is that affecting the length of their incarceration. Correct? Right. And what we were able to show in the evidence established is that because they ‑‑ under the old law before Prop 9 where you had the default of one year, okay, those prisoners who the Board itself was recognizing were close to parole by giving one or two year deferrals instead of three or four or five year deferrals, they were ‑‑ the Board was recognizing they were close to parole. And so those shorter deferrals was the safety net to make sure that people, that prisoners would get their parole grant close to reaching parole suitability. Now, underlying all this, you have to remember that the law in California is that when a prisoner reaches his minimal eligible parole date, which is 10 years on a second‑degree murder, 16 and two‑thirds years on a first‑degree murder, when a prisoner reaches his minimal eligible parole date, he has a legal right to be released unless there is evidence that supports a finding that he's still a danger. So ‑‑ But the statistics aren't showing that people are getting released at 10 and 16 and two‑thirds, right? No. Most people, this is beginning to change a little bit, but it's true that most people do not get released at their first or second hearings. I agree. But see, when you talk about is Prop 9 ‑‑ Then post‑Pop 9, the minimum is what? Three years. As opposed to one. Right. It's a mandatory minimum, but the default went from one year to 15 years, and to get under 15 years, the board has to find by clear and convincing evidence that public safety does not require 15 years. So it kind of flips the default. Absolutely. And it flips the finding. I mean, one of the things Judge Carlton had a big problem with is that in making that finding, the default of 15 years, and you can't go under 15 years unless the board finds clear and convincing evidence, that they're actually making the standard for getting a less than a 15‑year deferral higher than the standard to get out on parole and to be found suitable, because that finding only has to be made that the prisoner is no longer a danger, only has to be made by a preponderance of the evidence. But this isn't theoretical. There were all these examples that we presented, that there were people who got Prop 9 deferrals, who got to hearing earlier, either because of the Rutherford modification or because a court ordered that they get to hearing earlier, and they got to hearing earlier and were, in fact, found suitable by the board. So this is ‑‑ I'm not challenging, and Judge Carlton did not challenge any board finding. I assume for the purposes of argument that the board is always correct about who's suitable and not suitable. The fact of the matter is the board itself has found these people suitable earlier than their Prop 9 deferral, which shows not just the significant risk of increasing terms, it shows an actuality of increasing terms when they can't get to hearing earlier. And the PTA process is not getting them back to hearing earlier. And we supported all that with many, many examples of people who had reached suitability who, by the board's own determination, who had their PTAs denied. Mr. Brodheim, for example, had the board itself, subsequent to a denial, had the board himself find him suitable. That was set aside because Cook came down, but not for substantive reasons, just because Cook came down. And so then he moved to advance the Prop 9 deferral to advance his hearing, saying, well, the change in circumstances is you yourself have said I'm now suitable, and he was summarily denied. Sotomayor, you have used up your time, and I think we understand your position. Thank you. And I guess I would just refer you again to my brief on the Prop 89 stuff. Yes, thank you. You have about three in change. 343. Could I ask you just a comment? Do you agree with your learned opponent that you did not raise a Doebert 702 issue on the admission of the testimony of Dr. Crisberg? Your Honor, we moved the procedure was a little different because it was a bench trial. We let Dr. Crisberg testify and our expert testify, and at that point we moved to strike Dr. Crisberg's testimony as scientifically flawed. The district court denied that motion. Could you give me a citation to the record of that? I don't have it on hand, Your Honor. That was not one of your arguments on appeal, though, specifically. It is not a specific argument on appeal. That is true, Your Honor. So you don't argue that now? We do not dispute the admissibility of Dr. Crisberg. Thank you very much. Okay. A couple quick points here. The many, many examples that counsel just referred to, 13. The district court cited 13. So what would they have had to show to win here? First of all, the examples have to be representative of the class. There was no evidence below that the petition to advance examples were systematic. There was no expert testimony, nothing done to show that the board's decisions here represent the board's decisions as a whole. So you just — so your best argument is there were examples that, you know, we can't really — they're examples of something, but not what they had to prove here? Somewhat, Your Honor. As detailed in my brief, the district court — the examples themselves, we disagree with how the district court viewed them. But even if the district court's view of them was correct, it's legally insufficient to take 13 anecdotes to find class-wide relief without a systemic finding on top of those examples. But then that is also where you discount their expert. Incorrect, Your Honor. Their expert did not testify about the petition to advance process. There was no testimony from their expert regarding any of the petition to advance examples. But their expert did talk about the transferability of the statistics from the Rutherford group to the group as a whole. In terms of parole suitability decisions. Right. Not in terms of petition to advance decisions. Right. But if they are suitable and the only way to get — never mind. It's too complicated a question. But that would be — if that expert is believed by the district court permissibly, then those statistics would demonstrate how many people would actually have been eligible to get parole under the old system after one year or two years and not 15 years. I don't think that's correct, Your Honor. Because it's not clear that those — that number of people also submitted a petition to advance. I think what your court — No, I understand that they didn't necessarily. But the — it does describe the number of people who would be — according to the expert who would have been suitable under the old system. Correct, Your Honor. But that's what — Okay. And that gets us to the petition to advance process. Because as the voters recognize, sure, there's going to be a possibility that with the three-year deferral, somebody's going to qualify for your hearing sooner than that. The voters anticipated that. And that's why the petition to advance process was put in there. And what Rutherford at most shows is that, yes, there is a small fraction of inmates that might need a hearing faster than three years. And that's exactly why the petition to advance process exists. And that process, which is very similar to the ones approved in Garner and Morales, and as this court recognized the first time around, is one of the big reasons that this law is constitutional. Thank you, counsel. I see that I'm out of time. Thank you, Your Honors. Thank you. We appreciate the arguments of both counsel. They've been very helpful in this challenging case. The case is submitted and we are adjourned.
judges: Graber, Callahan, Bea